BRYANT v. LOS ANGELES & SALT LAKE R. CO.

No. 4703.   Decided March 11, 1929.   (275 P. 1108.)

*George H. Smith, J. V. Lyle, R. B. Porter,* and *Dana T. Smith,* all of Salt Lake City, for appellant.

*Sam Cline,* of Milford, for respondent.

STRAUP, J.

In 1923 the defendant constructed a branch line of railroad into Cedar City, Utah. The plaintiff, Rachel Bryant, and her husband, Joseph Bryant, owned and resided on a

lot in Cedar City 131.25 feet fronting on the west side of main street or on one of the principal streets of the city, and 198 feet deep. The entire lot was inclosed by a fence as one inclosure. The title to the north 48 feet of the lot was in the name of the plaintiff. The title to the south 83.25 feet was in the name of the husband. There was a small old frame house of two or three rooms, worth from $50 to $75, on the part of the lot the title to which was in the husband, and in which plaintiff and her husband lived. On April 20, 1923, the plaintiff and her husband entered into a written contract by the terms of which they, for the sum of $2,500, agreed to convey the entire lot to the defendant for a right of way and for other railroad purposes. Ten days thereafter they, upon payment to them of the sum of $2,500, by warranty deed, conveyed the entire lot to the defendant. Defendant immediately took posession of the entire lot, and by July, 1923, had constructed its railroad over the entire lot from north to south, as well as over lands lying to the north and to the south thereof. In April, 1926, the plaintiff commenced this action against the defendant, alleging that, when she executed the contract and the deed, it was her intention to convey only the portion of the lot owned by her husband, and not that owned by herself, and asked judgment against the defendant for the value of the portion owned by her, which she alleged to be $1,575.

The case was tried to the court as one in equity with an advisory jury. But three propositions were submitted to the jury: (1) Whether the plaintiff, when the contract and deed were executed, intended to convey her portion of the lot as well as that of her husband which the jury answered in the negative; (2) what the value of the entire lot was, which the jury found to be $3,075; and (3) what the value was of the portion owned by the plaintiff, which the jury found to be $875. The court accepted the first and second findings of the jury, but rejected the third, and found that value to be only $575. The court, however, made

findings on all of the issues and as alleged in the complaint, except as to the value of the portion of the lot claimed by the plaintiff, and rendered a judgment in her favor and against the defendant in the sum of $575. The defendant appeals.

The assignments challenge the sufficiency of the evidence to support the findings and the rulings of the court denying defendant's motions for nonsuit and a directed verdict.

The substance of the complaint is that, when the contract was signed and delivered, the plaintiff informed the agent of the defendant that she was the owner of the north 48 feet of the lot, pointed that part of the lot out to him, and stated that such part was not included in the parcel owned by her husband; that the agent stated and represented to her that he was purchasing only the parcel owned by her husband; that he would later take care of plaintiff's premises and the purchase thereof, and that the defendant would get such parcel when it needed it; that she was induced to sign and execute the deed on the statements and representations so made by such agent, and signed the contract and the deed believing that they contained a description of only the portion or parcel owned by her husband; that she attempted to read the description in the deed, but, because of ill health, old age (53 years), nervousness, and her inability to fully understand and comprehend legal descriptions of real estate, she was unable to determine and did not realize that the deed conveyed, not only the premises owned by her husband, but also the portion owned by her; that her husband, 69 years old, was suffering from a paralytic stroke, and was not well in mind or body; that neither she nor her husband was familiar with real estate descriptions or the manner in which descriptions are legally made, and that it was not until December, 1925, that she learned that the deed signed by her conveyed her portion of the lot as well as that of her husband; that the whole of the consideration for the conveyance was paid to her husband; that she got no part of it, and that the value of her

portion of the lot was $1,575, and, because it was occupied by the defendant's right of way, she could not use her land to an advantage, and that it could be used only for railroad purposes, to which it was then being devoted. She thus prayed that it be decreed that the portion of the lot owned by her and conveyed to the defendant "was conveyed by mistake and without consideration," and that she be given judgment for the sum of $1,575, the value of it.

The answer, in effect, was a general denial, with averments that the person transacting the business with the plaintiff and her husband in obtaining the contract and deed was the agent and representative of the Chamber of Commerce of Cedar City, and not of the defendant.

Eight or nine witnesses on behalf of defendant, real estate and business men residing in Cedar City, testified that the value of the entire lot at the time of the conveyance was from $1,250 to $1,500. The assessor put the value as low as $1,000. As to value the plaintiff called but one witness, who testified that the value was $30 a foot, or $3,937-50 for the whole lot. He, however, testified that he based such value, not on sales of property at about the time the conveyance was made, but on sales made six months thereafter, and after the railroad into Cedar City was completed and in operation. The only improvement on the lot was the little house in which the plaintiff and her husband resided, and a chicken coop and some fruit trees on the part the title of which was in the name of the plaintiff. She and her husband, however, occupied the entire lot as one lot.

The finding made by the court that the whole lot was of the value of $3,075 is against the clear and manifest weight of the evidence. It, too, is inconsistent with the finding made that the part of the lot owned by the plaintiff was of the value of $575, or about $12 a foot. At that rate the whole lot was of the value of only $1,575. The consideration paid by the defendant for the whole lot was $2,500. Before the defendant constructed its right of way into the city, it entered into a written contract with a committee of

the Chamber of Commerce of Cedar City and with others residing in the city to procure for it a right of way and lands for railroad purposes. It agreed to pay $70,000 for such purpose. Whatever expenses or costs were incurred over and above that amount were to be paid by the committee and businessmen of the city. The committee became active in acquiring lands for such purpose. Different members of the committtee called on the plaintiff and her husband at different times prior to April 20, 1923, with a view of purchasing the lot for a right of way. They first offered to pay $1,250 for the lot. Negotiations were had back and forth, first with one then with other members of the committee. The offer was raised to $1,500 and then to $1,800. Finally, a member of the committee informed the plaintiff and her husband that he thought he could induce the committee to pay $2,000, and later informed them that the committee would pay that amount. The plaintiff and her husband at first were inclined to accept that, but later declined to do so. In the meantime, rights of way were being acquired from others owning lots and lands along the street to the north and to the south of the lot owned by plaintiff and her husband. A Mr. Hill, who had charge of valuations of lands of the defendant, went to Cedar City to assist the right of way committee. At its request he called on plaintiff and her husband. He offered to pay them $2,500, and had prepared and took with him a written contract and a copy wherein the whole lot was described as a parcel of land 131.25 feet by 198 feet. He informed the plaintiff and her husband that the committee would pay $2,500, but no more, and that they could sign the contract or leave it alone; that, if they did not sign it, condemnation proceedings would be commenced to acquire a right of way over the lot. The contract was read over by the husband. The plaintiff asked him if it was all right. He said it was. Then both signed it as grantors, first the plaintiff and then her husband. By the contract, in plain terms, they agreed to convey to the defendant the whole lot described as a parcel of land 131.25

feet by 198 feet. The contract was duly executed and acknowledged in the presence of a notary public. Hill took the original contract with him and left the copy with the plaintiff and her husband.

With respect to this, the plaintiff testified that her husband brought Hill to the house with the contract; that, as they entered the house, the husband, pointing to the plaintiff, said to Hill "There she is, you will have to handle her"; that Hill "unrolled the papers, told me that I could suit myself whether I signed or not"; that "if you do not sign we are going to have the place anyway," and told her what they would do if she did not sign it; that Hill gave her husband a copy of the contract to read; that she spoke up and said to Hill, "I hope you understand that there is a piece of ground on the north side and that doesn't go in with Mr. Bryant's property"; that Hill replied he did not so understand it, and that "he thought it was the whole piece"; that she told him the north 48 feet belonged to her, and took Hill to the door, and pointed out to him the north 48 feet of the lot, and said "that would not go with the home"; that Hill replied, "We will see about this," "we must have it"; that he did not see how they could do without it; that they then returned to where her husband was reading the contract; that she asked him, "Is it all right," and stated she would sign anything he wanted her to sign, and that he said the contract was all right as far as he could see; that she asked him if she should sign it and he said, "Yes," and so she signed it.

A daughter of the plaintiff testified that Hill said to the plaintiff, "I want you to sign this contract for your home over to the railroad," and she said that whatever "Dad" did was all right with her; that before she signed it she pointed out to Hill the north 48 feet of the lot and told him "you understand that it does not go with the home lot," and Hill said he did not so understand it, and said, "We will have that too, we will get that piece anyhow, we will have to have it to go over."

Another witness on behalf of the plaintiff testified that Bryant and Hill came to the house, and Bryant, pointing to the plaintiff, said to Hill, "There she is, you will have to read with her"; that Hill said to her, "You can sign the contract or leave it, but we are going to put rails over your lot"; that thereupon she asked Hill if he was aware that the north 48 feet was not in Bryant's name; that he said he did not; that she then took him to the door and pointed out to him the north 48 feet; that Hill told her "we will have to have that piece we can't take this piece without it and we'll have to have it," and "we will see about that later"; that Bryant was reading the contract, and plaintiff asked him if it was all right, and he said it was, and then both signed it.

The plaintiff further testified that prior thereto she also said to a member of the committee that she owned the north 48 feet of the lot, and told him that, unless he could give $3,500 for the whole lot, the 48 feet did not go in with the other.

The testimony of the plaintiff and her witnesses that she pointed out or made any claim to the north 48 feet, or that such part of the lot was not to be included, was denied by Hill, and by divers members of the committee negotiating with the plaintiff and her husband for the entire lot, who testified that all of the conversations and dealings related to the entire lot, and that the plaintiff in the course of such dealings at no time intimated that any part of the lot was to be reserved or not to be included in the bargain.

The plaintiff further testified that her husband asked her to sign the contract; that, before doing so, he read it over; that she did not then read it, but signed it; that Hill left a copy with them and shortly thereafter, "I read it myself, as soon as I could do it, I didn't see that the frontage was 131 feet. I never noticed anything about the measurement. Yes, I read the agreement."

About ten days after the contract was signed and delivered, plaintiff and her husband were asked to go to the

bank and sign the warranty deed. She testified it was only a few days after the contract was signed. The deed was signed at the bank in the presence of a notary taking the acknowledgment. She testified that some controversy arose because the bank held out $25 in payment of an abstract of title. She at first protested signing the deed because of that. The contract, however, provided that she and her husband were to furnish an abstract of title. She made no other objections to signing the deed. She testified her husband told her to sign it; to get the matter settled up, "and so I signed it in the bank in the back room. It was not very light and I don't know whether I could have read it if I tried. If I had made an effort I suppose I could." She further testified, however, that she did not ask the notary or any one to read it to her, or that she did not understand the contents of the deed. Nor did she ask the notary or any one whether her portion of the lot was included in the description or whether it was a description of only that portion of the lot the title to which stood in the name of her husband. The plaintiff further testified that prior thereto her husband had sustained some injury to his arm, later had smallpox, and was paralyzed on one side; but she did not testify that he, when the contract was executed, was suffering from any infirmity, except that his hand was paralyzed. She did not testify, nor was there any evidence given to show, that his mental faculties were impaired, or that his mind was affected, or that he was not capable of attending to or transacting business, or that he was unable to read, or that he could not understand or comprehend what was read by him. According to her testimony, she trusted her husband to read the contract, took his judgment that it was all right, and, although she herself could read, signed the contract without herself reading it, but later read the copy and before she signed the deed. The description of the property in the contract was the same as in the deed, describing a parcel of land 131.25 feet by 198 feet.

It further was made to appear without dispute that, as

soon as the deed was executed and delivered, the plaintiff and her husband surrendered possession and occupancy of the whole of the lot, and knew that the defendant went into immediate possession of the whole of it, and constructed its railroad over the whole lot, that she made no objection thereto, and made no claim that the whole lot had not been, or was not intended to be, conveyed until nearly 3 years thereafter, and shortly before the commencement of this action.

When Hill, with plaintiff's husband, came to the house with the contract to be signed, the contract in plain terms was for a conveyance of the entire lot. The plaintiff testified Hill so understood the bargain when he came to the house to have the contract signed. Not anything is made to appear that he represented to her or to her husband that the contract was for a conveyance other than for the entire lot, or that he in any other particular misrepresented the contents of the writing. She trusted the reading of the contract to her husband, and declared she would sign anything he asked her to sign. He read the contract through, told the plaintiff it was all right, asked her to sign it, and she signed it. Looking at the evidence even most favorable to the plaintiff, there is not anything to show that her signature was obtained to the contract by fraud, deceit, or trickery; nor is it alleged that her signature was obtained in such manner or by such means. The judgment thus is not supported either by allegations or proof. 13 C. J. 370 et seq.; 1 Page on Contracts, §§ 228, 229, 433; 1 Elliott on Contracts, § 76.

Further, it is not alleged nor proven that there was any mutual mistake. The allegation as to mistake is merely that the plaintiff, when she signed the contract, intended only to convey the portion of the lot the title to which was in the name of her husband. The only proposition in such respect submitted to the jury was whether the plaintiff, when she signed the contract, intended to convey the part of the lot owned by her as well as that owned by her hus-

band. The jury found that in the negative, which finding was adopted by the court. That is far from alleging, proving, or finding any mutual mistake. The instrument was not sought to be reformed or avoided on any such theory, nor for any other reason. No such relief was sought. The plaintiff, though in equity—she at least so regarded her cause, and so presented and tried it—yet asked no equitable relief. Notwithstanding she claimed she signed the instrument intending to convey only a part of the lot, yet, without repudiating the contract for such or for any other reason, treated or regarded the contract what it on its face purports to be—a conveyance of the whole lot—and demanded compensation for the part of the lot owned by her and conveyed by the instrument. The contract was binding between the parties or it was not. In determining the binding effect, the intention of the parites, among other things, is looked to, not only the intent of one of them but all of them to the contract. When language of the contract is plain and not ambiguous, the intent ordinarily is determined by the language, unless in the execution of the contract the assent of the one party is procured by fraud or by false or fraudulent representations of the other. Upon such allegations and proof, let it be assumed, the plaintiff could have affirmed the contract and treated it as a conveyance of the entire lot and maintained an action to recover damages sustained by her by reason of the fraud, and that in such case an affirmance of the contract would not be a waiver of the fraud nor a bar to a recovery of such damages, yet the record is barren of any such allegations or proof.

Though the case be regarded as one of allegations and proof of false and fraudulent representations by reason of which the plaintiff was induced to enter into the contract, and on the theory that she affirmed the contract and sought to recover damages sustained by her by reason of the fraud, yet, on the record, no damages were sustained by her. By the great and manifest weight of the evidence—substantial-

ly without dispute—the value of the whole lot was only from $1,250 to $1,500. Admittedly, the consideration paid by the defendant was $2,500. By the great and manifest weight of the evidence, the record also shows that such consideration was paid for the whole lot. It is so plainly recited in the contract and in the deed. Though the husband was not a witness, yet on the record it is evident he regarded the contract as a conveyance of the whole lot and the consideration paid as a consideration for the whole of it. From the facts and circumstances in the record it is highly improbable that the defendant, in securing a right of way from the plaintiff and her husband, sought a right of way over only the south part of the lot, and not also over the north part, only over the part owned by the husband, and not over the part owned by the plaintiff. Admittedly, upon the execution and delivery of the deed and payment of $2,500, the plaintiff and her husband vacated not only a part but the whole of the lot, and surrendered possession of the whole of it to the defendant, who immediately with the knowledge of the plaintiff commenced to construct its railroad over the whole lot; and not for a period of nearly 3 years thereafter did the plaintiff make any claim that the whole lot as expressed in the contract and in the deed was not conveyed to the defendant.

On the record, we think the allegations of the complaint and the proof are insufficient to support the judgment. It is therefore reversed and the cause remanded for a new trial. Costs to the appellant.

CHERRY, C. J., and HANSEN, HANSON, and FOLLAND, JJ., concur.